Lindsey ("Linzie") VINCENTY; Valerie Adams, on behalf of her minor son Kereem Adams; Gino Castignoli, on behalf of his minor daughter Melissa Castignoli; Fernando Carlo; Rhea David, on behalf of her minor daughter Loyette David; Nellie Dumont; and Vincent Schiano, Plaintiffs–Appellees,

v.

Michael R. BLOOMBERG, Mayor of the City of New York; Peter F. Vallone, Jr., Chair, Committee on Public Safety, New York City Council, in their individual capacities; and the City of New York, Defendants–Appellants.

Docket No. 06–2106–CV.

United States Court of Appeals, Second Circuit.

Argued: Oct. 17, 2006.

Decided: Feb. 1, 2007.

Daniel M. Perez, New York, New York (David Pressman, Kuby & Perez, on the brief), for Plaintiffs–Appellees.

Scott Shorr, Senior Corporation Counsel, New York, New York (Michael A. Cardozo, Corporation Counsel of the City of New York, Ronald E. Sternberg, on the brief), for Defendants–Appellants.

Before: KEARSE, SOTOMAYOR, and B.D. PARKER, Circuit Judges.

KEARSE, Circuit Judge:

The present action arises out of a recent legislative attempt by defendant City of New York ("City") to combat the widespread problem of graffiti vandalism, *i.e.*, the unauthorized placement of graffiti on the property of another. As amended in December 2005, the City's Administrative Code ("Code" or "City Code") prohibits the sale of, *inter alia*, aerosol spray paint containers and broad tipped indelible markers to persons under 21 years of age, *see* N.Y.C. Admin. Code § 10–117(c) (2006), and generally prohibits persons under the age of 21 from possessing such items on property other than their own, *see id.* § 10–117(c–1). The present action was commenced in the United States District Court for the Southern District of New York in April 2006 by or on behalf of artists whose ages then ranged from 16 to 20, challenging the constitutionality of §§ 10–117(c) and (c–1) on the grounds that those subsections' prohibitions with respect to spray paint and markers (a) violate plaintiffs' First Amendment rights to freedom of expression, and (b) discriminate against plaintiffs on the basis of age in violation of their rights to equal protection. Plaintiffs promptly moved for a preliminary injunction prohibiting defendants from enforcing those provisions during the pendency of the action.

The district court, George B. Daniels, *Judge*, granted the motion for a preliminary injunction to the extent of prohibiting the City from enforcing the spray paint and marker provisions of §§ 10–117(c) and (c–1) against young adults over the age of 18 but under the age of 21. (Under New York law, *see, e.g.*, N.Y. Dom. Rel. Law § 2 (McKinney 2006), and N.Y. Gen. Oblig. Law § 1–202 (McKinney 2006), New York residents are adults at age 18.) The court found, *inter alia*, that plaintiffs are likely to prevail on their claims that the challenged provisions violate their First Amendment and equal protection rights. Defendants have appealed, contending principally that the district court erred in

finding that plaintiffs are likely to prevail on the merits of their claims; defendants also contend that plaintiffs failed to show that they would suffer irreparable injury in the absence of a preliminary injunction. For the reasons that follow, we affirm the preliminary injunction on the basis of plaintiffs' First Amendment claims.

## I. BACKGROUND

For decades, the City has been confronted with a "growing problem of vandalism and public defacement by means of making unauthorized graffiti." (Complaint ¶ 26.) In the City's administrative code in 1985 ("1985 Code"), § 435–13.2, the predecessor of § 10–117, contained provisions that, *inter alia*, forbade any person to write, draw, or paint any inscription, figure, or mark on public or private property without the express permission of the owner or operator of the property, *see* 1985 Code § 435–13.2(a); prohibited any person from carrying an aerosol spray paint can or a broad tipped indelible marker into any public building or other public facility with the intent to violate § 435–13.2(a), *see* 1985 Code § 435–13.2(b); and prohibited the sale of such items to any person under the age of 18, *see id.* § 435–13.2(c); *see also* New York State Laws of 1985, ch. 907, § 14 (renumbering City Code § 435–13.2 as § 10–117).

In December 2005, amendments to § 10–117 were adopted to expand former § 435–13.2(c)'s prohibitions by raising the age restriction on the sale of such items from 18 to 21 and by introducing a strict-liability provision that prohibits persons under the age of 21 from possessing such items in certain places, regardless of intent.

### A. *The Challenged Provisions of the City Code*

The new or amended subsections that are challenged in this action provide as follows:

(c) No person shall sell or offer to sell an aerosol spray paint can, broad tipped indelible marker or etching acid to any person under twenty-one years of age.

(c–1) No person under twenty-one years of age shall possess an aerosol spray paint can, broad tipped indelible marker or etching acid on the property of another or in any public building or upon any public facility.

N.Y.C. Admin. Code §§ 10–117(c) and (c–1) (2006). The term "broad tipped indelible marker" is defined (as it was in the 1985 Code) to "mean any felt tip marker or similar implement containing a fluid that is not water soluble and which has a flat or angled writing surface one-half inch or greater," *id.* § 10–117(e). The term "public facility" is not defined.

For persons charged with violating subsection (c–1), the Code provides for affirmative defenses as follows:

(c–2) When a person is found to possess an aerosol spray paint can, broad tipped indelible marker or etching acid while on the property of another or in any public building or upon any public facility in violation of subdivision c–1 of this section, it is an affirmative defense that:

(1) the owner, operator or other person having control of the property, building or facility consented to the presence of the aerosol spray paint can, broad tipped indelible marker or etching acid; or

(2) such person is traveling to or from his or her place of employment, where it was or will be used during the course of such employment and used only under the supervision of his or her employer or such employer's agent.

*Id.* § 10–117(c–2).

A first violation of the sale prohibition in § 10–117(c) is a misdemeanor punishable

by a fine of up to $500 and/or imprisonment for up to three months; a second or successive violation of that provision is a Class A misdemeanor punishable by a fine of up to $1,000 and/or imprisonment for up to one year. *See id.* § 10–117(f). Noncompliance with the possession prohibition in § 10–117(c–1) is a "violation" that is punishable by a fine of up to $250 and/or imprisonment for up to 15 days. *Id.* § 10–117(f).

## B. *The Plaintiffs and the Preliminary Injunction Motion*

The present action was brought by or on behalf of artists and aspiring artists who wish to create graffiti art in lawful venues on lawful surfaces such as canvas, wood, and apparel. Plaintiffs include two college students (Lindsey Vincenty and Nellie Dumont) studying film and/or visual arts; parents of three high school students, suing on behalf of those students (Valerie Adams, on behalf of her son Kereem Adams, Gino Castignoli, on behalf of his daughter Melissa Castignoli, and Rhea David, on behalf of her daughter Loyette David); one aspiring graffiti artist (Fernando Carlo) whose father is a well known graffiti artist; and one person who is employed as a painter's apprentice (Vincent Schiano). The complaint seeks (a) a declaration that §§ 10–117(c) and (c–1) of the Code violate the First and Fourteenth Amendments, and (b) a permanent injunction against enforcement of those subsections.

By order to show cause, plaintiffs moved for a preliminary injunction against enforcement of the spray paint and marker provisions of §§ 10–117(c) and (c–1), clarifying in their memorandum of law that they did not challenge or seek an injunction with respect to so much of those subsections as regulate the sale or possession of "etching acid" (Plaintiffs' Memorandum

of Law in Support of Order To Show Cause at 7 n.1 ("Since no plaintiff wishes to possess etching acid, this provision of the Code is not before the Court.")). In support of their request for an injunction with respect to the provisions governing sale and possession of aerosol spray paint containers and broad tipped indelible markers, the aspiring graffiti artists submitted, *inter alia,* affidavits describing their desire only to produce lawful graffiti art and ways in which the challenged provisions stifle their artistic expression. For example, Vincenty, who attends the School of Visual Arts in Manhattan and has already created more than 100 lawful works of graffiti art, asserted:

> I literally cannot function without spray paint and markers. Spray paint covers differently than other paints applied with a brush, such as mists, fades and blends. It dries faster, so I can layer more quickly. It covers well, smoothly and evenly. The fact that I cannot purchase spray paint or broad tipped markers legally limits my ability to express myself creatively.

(Affidavit of Lindsey ("Linzie") Vincenty dated April 13, 2006 ("Vincenty Aff."), ¶ 6.) However, because of § 10–117(c), Vincenty has been unable to purchase spray paint and broad tipped indelible markers at stores in the City. (*See id.* ¶ 5.) Further, although she needs those materials for her classes, she cannot, in light of § 10–117(c–1), take them with her on the subway from her home in Brooklyn to the school in Manhattan. (*See id.* ¶ 7.)

Dumont, a film major who also attends the School of Visual Arts, is also a visual artist who uses spray paint. She attempted to buy spray paint in a Manhattan hardware store in order to stencil a canvas in her room but learned that she could not purchase it because of her age; because she could not purchase the spray paint,

she did not paint her picture. (*See* Affidavit of Nellie Dumont dated April 13, 2006, ¶ 5.) She purchases spray paint near her parents' home in upstate New York (*see id.*); but she "fear[s] being arrested in public, if [she] walk[s] around with spray paint or markers" in the City (*id.* ¶ 7).

Each of the high-school-student plaintiffs uses broad tipped indelible markers (and would like to use spray paint) to produce art work on such surfaces as paper, canvas, or clothing. They like to use broad tipped markers because, *inter alia,* the work goes faster, and such markers produce brighter colors and different textures. These plaintiffs have been unable to buy broad tipped indelible markers; they have received them from adult relatives but fear arrest if caught possessing them while en route to school. (*See, e.g.,* Affidavit of Kereem Adams dated April 17, 2006, ¶¶ 3–5, 7–8; Affidavit of Loyette David dated April 18, 2006 ("David Aff."), ¶¶ 4, 7; Affidavit of Melissa Castignoli dated April 18, 2006, ¶¶ 5, 7.) In addition, Castignoli stated that she had felt compelled to decline a friend's request to artistically spray-paint his shirt, for which she would have been paid. (*See id.* ¶ 5.)

Schiano is both a graffiti artist and a unionized painter's apprentice. He uses spray paint in connection with his job, and his responsibilities include procuring painting supplies. He stated that in connection with his job, he has used

> spray paint on surfaces such as metal, door hinges, hardware, and any other surfaces the customer wishes to be spray painted. I have spray painted a mural in the auditorium of a public school (IS 278, in Marine Park). I have spray painted cartoon characters in children's bedrooms.

(Affidavit of Vincent Schiano dated April 17, 2006 ("Schiano Aff."), ¶ 4.) As an artist, Schiano uses spray paint on canvas and t-shirts, as well as on the wall of his parents' garage. However, because of his age (20 at the commencement of this action) he feared that if he were "caught with spray paint in a truck while working, or on a sidewalk walking home, or anywhere in the City of New York," even "for the purpose of making art in [his] home or painting on the job," he would be "subject to arrest and criminal prosecution." (*Id.* ¶ 10.) Schiano stated:

> There have been occasions when I wanted to create artistic works but I have not, due to the Administrative Code provisions. I simply wish to be able to buy my art supplies. I wish to be able to carry them home on the subway or in a taxi, or while walking on a sidewalk or through a park, or on my way to or from work, without fear of arrest. I wish to be able to express myself freely and without fear, and I wish to be able to work without fear. Under these provisions of the Administrative Code, I am unable to do so . . . .

(*Id.* ¶ 13.)

At the final hearing on their preliminary injunction motion, plaintiffs "concede[d] that the [C]ity has a compelling interest in fighting illegal graffiti." (Hearing Transcript, May 1, 2006 ("May 1 Tr."), at 3 (statement by plaintiffs' counsel).) But they contended that, in limiting artistic expression by law-abiding persons who have no intention of making unauthorized graffiti, §§ 10–117(c) and (c–1) violate their rights under the First Amendment because those provisions are not precisely tailored to serve the City's interest in combating graffiti vandalism, are not necessary to serve that interest, and do not serve that interest. They also argued that those subsections deny them equal protection by discriminating against them on the basis of age.

Defendants opposed the preliminary injunction motion, presenting evidence that, nationwide, graffiti is the most common type of property vandalism, constituting 35% of all property crimes (*see* Declaration of City Assistant Chief of Police Edwin A. Young dated May 1, 2006 ("Young Decl."), ¶ 5), and that the annual clean-up costs total $8–15 billion (*see* Declaration of City Assistant Corporation Counsel Virginia Waters dated April 27, 2006, ¶ 9.) The City, between 2002 and 2005, had cleaned graffiti from more than 67 million square feet of property. (*See, e.g.,* Young Decl. ¶ 5.)

Defendants presented evidence that between 2003 and April 17, 2006, City police had made more than 6,000 arrests for alleged violations of New York State anti-graffiti laws, N.Y. Penal Law §§ 145.60 and 145.65 (McKinney 2006) (prohibiting, respectively, the making of graffiti on public or private property "with intent to damage such property" and the possession of graffiti instruments "under circumstances evincing an intent to use same in order to damage such property"). The City made 1,237 such arrests in 2003, 1,446 in 2004, 2,585 in 2005, and 871 between January 1 and April 17, 2006 (*see* Young Decl. ¶ 21); and "the majority of the graffiti offenders are under 21 years of age—69% in 2003, 71% in 2004, 73% in 2005 and almost 75% in 2006" (*id.* ¶ 22). "In 2003 and 2004 approximately 20% of the arrests were of persons 18–20. (18% in 2005 and 15% so far in 2006)." (*Id.* ¶ 23.) With respect to the newly enacted subsection (c–1), for which an alleged violator is not arrested but rather is issued a Criminal Court Summons (*see id.* ¶ 18), the City had issued five Summonses by May 1, 2006, three for persons under age 18 and two for persons over 18 but under 21 (*see id.* ¶ 24).

Defendants argued that §§ 10–117(c) and (c–1) are content neutral, do not proscribe any First Amendment activity, and are narrowly tailored responses to the problem of unlawful graffiti and to the experience that 15–20% of the persons violating the anti-graffiti provisions were 18–20 years of age.

Defendants also argued that plaintiffs had not shown that a preliminary injunction was needed to avoid irreparable injury. They stated, *inter alia,* that police officers have "discretion" not to issue Summonses for possession of the prohibited items by a person under the age of 21 on a City street or sidewalk "adjacent" to his or her school or home:

> Police Officers issue Criminal Summonses only after they assess each situation individually. *Officers have been trained to use their discretion* and make a case-by-case decision as to whether or not to issue a Criminal Summons in a particular situation. So for example, if a person under 21 is seen to be in possession of the prohibited materials *on public property adjacent to an art school and explains that he/she is an art student with a valid art school ID and has just left the school,* the office[r] *may* appropriately determine that a Summons is not warranted. Similarly if an officer sees a person under 21 who is *in front of a private house* clearly possessing the prohibited materials, the officer, after a preliminary investigation, *may* decide not to issue a Summons.

(Young Decl. ¶ 25 (emphases added); *see also* Defendants' Memorandum of Law in Opposition to Plaintiffs' Order To Show Cause ("Defendants' Memorandum of Law") at 11 (reiterating the Assistant Police Chief's description of police discretion and adding that as to a young adult in front of private property, the officer may inquire of the property owner and decline to issue a Summons if the officer decides that the requisite consent has been given).)

Defendants also stated that although police officers might seek to make random searches of backpacks on the subway, "[t]hese searches are entirely voluntary. A person can refuse to have his/her bag searched and leave the location of the inspection." (Young Decl. ¶ 26; Defendants' Memorandum of Law at 11.)

## C. *The Decision of the District Court*

In a decision announced from the bench at the close of the May 1 hearing, the district court granted the motion in part and denied it in part. As to persons under the age of 18, the court denied the motion. It found that, in light of the fact that sales of aerosol spray paint containers and broad tipped indelible markers to persons in that age group had been prohibited by the 1985 Code, the non-adult plaintiffs had not shown, *inter alia,* a likelihood that they would suffer irreparable injury in the absence of a preliminary injunction. (*See* May 1 Tr. 67–68.)

However, as to "young adults 18, 19 and 20" (*id.* at 61) (hereinafter "young adults") the court concluded that plaintiffs had shown both the likelihood of irreparable injury if a preliminary injunction were not issued, and a likelihood of success on the merits of their First Amendment and equal protection claims (*see id.* at 59–62). The court concluded that the requisite showing of irreparable injury had been made, given, *inter alia,* the likelihood of plaintiffs' success on the merits of their claims (*see* May 1 Tr. 58–59, 61), and the fact that the challenged subsections not only significantly hamper their expressive activities but also subject them to criminal prosecution (*see id.* at 58). The court noted as to subsection (c–1) that

the city has provided information ... that five summonses have already been—they characterize it as enforcement actions—five summonses have al-

ready been issued for violation of this section, so that it is obviously sufficient evidence to conclude that future arrests or summonses are likely to occur absent an injunction in this case.

(*Id.* at 59.) The court concluded that a preliminary injunction was needed because it was not appropriate "to leave it up to the discretion of the Police Department to decide how to enforce this regulation" (*id.* at 66).

As to the likelihood of plaintiffs' success on the merits of their First Amendment claims, the court began by finding that the challenged provisions are content neutral and thus are to be subjected to an intermediate level of scrutiny, under which they need not "be the least restrictive or the least intrusive means of achieving" the governmental interest, so long as they are narrowly tailored to "promote[ ] a substantial government interest that would be achieved less effectively absent the regulation[s]." (May 1 Tr. 59–60.) Regulations that are narrowly tailored to serve a substantial government interest are to be upheld "as long as they are reasonable, ... and leave open ample alternative channels for communication." (*Id.* at 59.) The court found that although §§ 10–117(c) and (c–1) were clearly meant to serve the City's interest in preventing graffiti vandalism (*see id.* at 60), those subsections did not meet the two latter facets of the test:

I find that with regard to the First Amendment argument, that the plaintiffs have demonstrated a likelihood of success on the merits, that the record indicates that the restrictions placed on young adults 18, 19 and 20 are not reasonable. It is unreasonable, it appears in the abstract, without fully developing the record any further at this point, but for the purpose of a preliminary injunction during the resolution of this case, it initially appears unreasonable to tell

young artists that they have the right to express themselves in the manner in which they wish to express themselves, but at the same time telling them that their art is perfectly appropriate, but to set significant, unreasonable restrictions with regard to their ability to obtain the tools to communicate their art.

(*Id.* at 61–62.) Given the record before it, the court found it "an unreasonable restriction to say to adults" (*id.* at 62) who "are without criminal intent" (*id.* at 66) that "they cannot purchase and they cannot transport in public or possess in any public building or conveyance" the supplies they need and intend for lawful use (*id.* at 62).

This amendment, in prohibiting and criminalizing the sale, the purchase and possession by responsible adults over 18 of spray paint and wide tip markers, even where those individuals have a legitimate purpose for their use, appears to be at this stage of the proceedings an unreasonable restriction and does not, pursuant to the standard that must be used, appears to not leave open ample alternative channels for communication and expression, as is the right under the First Amendment.

(*Id.; see also id.* at 63 (finding it unreasonable that young adult artists who work with spray paint and broad tipped indelible markers "have no right to obtain these materials even though their expression is perfectly legitimate and perfectly legal").) The court concluded: "I find at this stage of the proceeding, on this record, . . . there is a likelihood of success" on the First Amendment claim, as "this is not a reasonable restriction on the time, place or manner of expression. It does not leave open alternative channels of communication . . . consistent with the First Amendment." (*Id.* at 65–66.)

The district court also found that plaintiffs had shown a likelihood of success on their equal protection claims, stating that "the city must treat similarly-situated individuals similarly in the absence of an adequate reason to distinguish between them" (May 1 Tr. 60). The court noted that the statistics submitted by defendants indicate that while the number of graffiti vandalism arrests had steadily increased, the percentage of arrested persons who were 18–20 years of age had steadily decreased (*see id.* at 64–65), and it found that there was "no rational basis to single out 18–year–olds, 19–year–olds and 20–year–olds for different treatment than any other group of people in the adult population" (*id.* at 65).

A written injunctive order was entered, stating as follows:

For the reasons stated on the record, the City of New York is preliminarily enjoined from enforcing that portion of the amendments to N.Y.C. Admin. Code § 10–117 *et seq.* that prohibit the sale to and possession by adults between the ages of eighteen and twenty of aerosol spray paint containers and broad tipped indelible markers.

Order dated May 1, 2006 ("May 1 Order").

D. *The Issues on This Appeal*

Defendants have appealed, contending that the district court erred in its application of the standard for a preliminary injunction. Plaintiffs have not appealed from the district court's denial of a preliminary injunction with respect to persons below the age of 18.

We note that the language of the May 1 Order lacks a certain precision. *See generally* Fed.R.Civ.P. 65(d) ("[e]very order granting an injunction . . . shall [*inter alia*] be specific in terms"). The May 1 Order's reference to amendments to " § 10–117 *et seq.*" could be interpreted to

encompass relevant amendments to sections of the Code subsequent to § 10–117, if any, as well as all amended subsections of § 10–117, including, for example, subsection (b), which prohibits all persons, including young adults, from possessing aerosol spray paint containers and broad tipped indelible markers (hereinafter "graffiti implements") in any public place with the intent to engage in graffiti vandalism. Further, the May 1 Order's reference to persons "*between* the ages of eighteen and twenty" (emphasis added) is facially ambiguous as to the upper age of the group protected by the injunction.

Plaintiffs have challenged only §§ 10–117(c) and (c–1) of the Code, however, and the parties have litigated the constitutionality of only those two subsections. (*See* Defendants' brief on appeal at 2, 16; Plaintiffs' brief on appeal at 3–4.) And both sides plainly understand that the injunction protects young adults not just to, but through, the age of 20, *i.e.,* persons over the age of 18 but under the age of 21 (*see* Defendants' brief on appeal at 3, 37; Plaintiffs' brief on appeal at 18). Thus, no party has raised an issue as to the propriety of the May 1 Order's language. Nonetheless, it would be prudent for the district court to amend the order to clarify the precise sections that are the subject of the injunction and the precise age group protected.

## II. DISCUSSION

 A motion for a preliminary injunction that would prohibit a government from taking action in furtherance of the public interest pursuant to a statutory or regulatory scheme should not be granted unless the moving party demonstrates both a likelihood of success on the merits, and the likelihood of irreparable harm if an injunction is not granted. *See, e.g., Fifth Avenue Presbyterian Church v. City of New York,* 293 F.3d 570, 573–74 (2d Cir. 2002); *Bery v. City of New York,* 97 F.3d 689, 693–94 (2d Cir.1996), *cert. denied,* 520 U.S. 1251, 117 S.Ct. 2408, 138 L.Ed.2d 174 (1997); *Plaza Health Laboratories, Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir.1989). We review a district court's grant of a preliminary injunction for abuse of discretion. *See, e.g., Ashcroft v. American Civil Liberties Union,* 542 U.S. 656, 664, 124 S.Ct. 2783, 159 L.Ed.2d 690 (2004) ("*Ashcroft v. ACLU*"); *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 931–32, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975); *Bronx Household of Faith v. Board of Education,* 331 F.3d 342, 348 (2d Cir.2003). A district court abuses its discretion " 'when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions.' " *Mastrovincenzo v. City of New York,* 435 F.3d 78, 88 (2d Cir.2006) (quoting *Zervos v. Verizon New York, Inc.,* 252 F.3d 163, 169 (2d Cir.2001)). The ultimate question, however, remains whether, in light of the applicable standard, the court has abused its discretion; and "[i]f the underlying constitutional question is close, therefore, we should uphold the injunction ...." *Ashcroft v. ACLU,* 542 U.S. at 664, 124 S.Ct. 2783.

On this appeal, defendants contend that the district court erred in finding that plaintiffs had established a likelihood of success on the merits of their First Amendment and equal protection claims and in finding that they had demonstrated a likelihood of irreparable injury in the absence of a preliminary injunction. Although we are skeptical of the district court's conclusion with respect to plaintiffs' equal protection claims, *see, e.g., Kimel v.*

*Florida Board of Regents,* 528 U.S. 62, 83, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) ("States may discriminate on the basis of age without offending the Fourteenth Amendment if the age classification in question is rationally related to a legitimate state interest."), we need not reach that basis for the district court's decision because we find no abuse of discretion in the court's issuance of a preliminary injunction on the basis of plaintiffs' First Amendment claims.

### A. *Likelihood of Success on the First Amendment Claims*

■ The district court properly found—and the parties now seem in agreement—that Code §§ 10–117(c) and (c–1) are content neutral. The applicability of §§ 10–117(c) and (c–1) does not depend on the nature or content of the idea that an artist wishes to express but only on the materials that would be the medium of expression. In regulating the sale and possession of such materials, the challenged subsections regulate conduct and only incidentally impact the artists' speech. *See generally Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) ("Government regulation of expressive activity is content neutral so long as it is justified without reference to the content of the regulated speech." (emphasis and internal quotation marks omitted)).

■ The appropriate standard by which to evaluate the constitutionality of a content-neutral regulation that imposes only an incidental burden on speech is the intermediate level of scrutiny. *See, e.g., Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 642, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994); *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). Under such scrutiny, the regulation must be narrowly tailored; it will be sustained if

"it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; *and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.*"

*Turner,* 512 U.S. at 662, 114 S.Ct. 2445 (quoting *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)) (emphasis ours).

To satisfy this standard, a regulation need not be the least speech-restrictive means of advancing the Government's interests. "Rather, the requirement of narrow tailoring is satisfied 'so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Ward, supra,* [491 U.S.] at 799, 109 S.Ct. 2746 (quoting *United States v. Albertini,* 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985)). *Narrow tailoring in this context requires, in other words, that the means chosen do not "burden substantially more speech than is necessary to further the government's legitimate interests." Ward, supra,* [491 U.S.] at 799, 109 S.Ct. 2746.

*Turner,* 512 U.S. at 662, 114 S.Ct. 2445 (emphasis ours).

■ Thus, "Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward,* 491 U.S. at 799, 109 S.Ct. 2746. The "essence of narrow tailoring" is having the regulation "focus[ ] on the source of the evils the city seeks to eliminate ... and eliminate[ ] them without at the same time banning or significantly restricting a substantial quantity of speech

that does not create the same evils." *Id.* at 799 n. 7, 109 S.Ct. 2746. For example, a city has a legitimate aesthetic interest in forbidding the littering of its public areas with paper, *see, e.g., Martin v. City of Struthers,* 319 U.S. 141, 143, 63 S.Ct. 862, 87 L.Ed. 1313 (1943); *Schneider v. State of New Jersey,* 308 U.S. 147, 160–61, 60 S.Ct. 146, 84 L.Ed. 155 (1939); but that could not justify a prohibition against the public distribution of handbills, even though the recipients might well toss them on the street.

> A ban on handbilling, of course, would suppress a great quantity of speech that does not cause the evils that it seeks to eliminate, whether they be fraud, crime, litter, traffic congestion, or noise. See *Martin v. Struthers,* 319 U.S. 141, 145–146, 63 S.Ct. 862, 87 L.Ed. 1313 (1943). For that reason, a complete ban on handbilling would be substantially broader than necessary to achieve the interests justifying it.

*Ward,* 491 U.S. at 799 n. 7, 109 S.Ct. 2746; *see also City Council v. Taxpayers for Vincent,* 466 U.S. 789, 808–09, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) ("the esthetic interest in preventing the kind of litter that may result from the distribution of leaflets on the public streets and sidewalks cannot support a prophylactic prohibition against the citizen's exercise of that method of expressing his views"; cities may "adequately protect the esthetic interest in avoiding litter without abridging protected expression merely by penalizing those who actually litter"). Although these examples come from cases dealing with limitations on conduct that was itself expressive, they reflect the fundamental general principle,

> deeply etched in our law[, that] a free society prefers to punish the few who abuse rights of speech *after* they break the law than to throttle them and all others beforehand.

*Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 559, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (emphasis in original).

In the present case, the City contends principally that, in applying the intermediate-scrutiny standard, the district court erred in (a) interpreting subsection (c–1) as prohibiting persons under the age of 21 from possessing aerosol spray paint containers and broad tipped indelible markers "in all public places" (*e.g.,* Defendants' brief on appeal at 23, 42 n.13; *see* Defendants' reply brief on appeal at 5 ("anywhere in the City")), and (b) finding that §§ 10–117(c) and (c–1) burden substantially more speech than is necessary to further the City's interest in preventing graffiti vandalism. They also argue that the court employed an inapposite "overbreadth" analysis, mistakenly characterized subsection (c) as "criminalizing the 'purchase' of spray paint or markers," and erred in finding that §§ 10–117(c) and (c–1) do not leave graffiti artists sufficient channels of expression and communication. (Defendants' brief on appeal at 19, 24, 27, 29.) For the reasons that follow, we see no basis for reversal.

1. *The Scope of Subsection (c–1) as Presented by the City in the District Court*

In this Court, the City has argued that § 10–117(c–1) does not prohibit young adults from possessing graffiti implements in all public places. At the oral argument of this appeal, the City proffered the interpretation that subsection (c–1) prohibits possession of such implements on buses, trains, and subways, but does not prohibit such possession on subway platforms or on City streets or sidewalks. This is contrary, however, to the interpretation of subsection (c–1) argued by defendants to the district court.

In opposing the preliminary injunction motion in the district court, defendants submitted the declaration of Assistant Police Chief Young, which, as set out in Part I.B. above, described police officers as having "discretion" under subsection (c–1) to refrain from issuing a Criminal Summons to a young adult who possesses graffiti implements "on public property adjacent to an art school"—assuming he or she "is an art student with a valid art school ID" and "has just left the school"—or "in front of a private house." (Young Decl. ¶ 25.) This interpretation was reiterated in defendants' memorandum of law. The plain implications of these examples of the City streets or sidewalks on which an officer might exercise his or her "discretion" to refrain from issuing a Criminal Summons are that (1) subsection (c–1) indeed encompasses possession of the prohibited graffiti implements on City streets and sidewalks, and (2) if the young adult possessing the prohibited implements is not in close proximity to his or her home or art school, he or she is likely to be issued a Criminal Summons.

These inferences from defendants' written interpretation of subsection (c–1) are further supported by the interpretation given to the district court by their attorney in oral argument. For example, counsel argued that the challenged subsections represented "a legislative determination [that] graffiti is largely caused by people who are 12 to 20 and that those materials should not be sold *or carried in public* by people in that age group." (Hearing Transcript, April 27, 2006 ("April 27 Tr."), at 25 (emphasis added).) The court asked whether "the statute restricts or does not restrict the possession in a public place" (*id.* at 20). The Assistant Corporation Counsel's responses were that

— "in a public place, a person under 21 cannot possess markers or spray paint" (*id.* at 21);

— "You cannot under the law carry in public, on public transportation your supplies to school" (*id.* at 22); and

— "there is no fundamental right to walk around with spray paint or markers" (*id.* at 24).

Although on appeal defendants refer to this view of subsection (c–1) as "mistaken" (Defendants' brief on appeal at 23), they cannot sensibly be sustained in their argument that the district court abused its discretion by accepting their representations. Plainly, the court's inference that young adults are forbidden to possess or transport graffiti implements "in public" accurately reflected defendants' own representation that a young adult possessing graffiti implements cannot, without vulnerability to prosecution under subsection (c–1), "carry [them] in public, on public transportation" and cannot "walk around" with them "in a public place."

2. *Burden on Lawful Speech vs. Need To Reach the City's Goals*

Nor can we see error in the district court's finding that it appears, at this stage of the proceedings, that the challenged subsections impose a substantially greater burden on innocent speech than is needed for achievement of the City's legitimate goal of combating graffiti vandalism. As to the need for subsection (c)'s increase of the minimum age from 18 to 21 for persons to whom aerosol spray paint containers and broad tipped indelible markers can lawfully be sold, defendants offered no evidence other than their statistics as to the percentages of the persons arrested for other graffiti offenses (*i.e.,* making unlawful graffiti or possessing graffiti implements with intent to do so) who were ages 18 through 20 (15–20%) (*see* Young Decl. ¶ 23). Yet, while the number of graffiti vandalism arrests was increasing in 2003–2005, during the same period the percent-

age of arrested persons who were 18 through 20 years of age was steadily decreasing (*see id.* ¶¶ 21, 23).

As to subsection (c–1), defendants' counsel at the oral argument of this appeal acknowledged that that subsection is "a strict-liability statute." A young adult possessing an aerosol spray paint container or a broad tipped indelible marker in a prohibited area is subject to criminal prosecution even if his or her intent is entirely innocent. Thus, subsection (c–1) forbids even conduct that does not threaten the evils that the City seeks to eliminate.

Although the Code provides for affirmative defenses of owner consent, *see* N.Y.C. Admin. Code § 10–117(c–2)(1), and employment relatedness, *see id.* subsection (c–2)(2), those defenses do not prevent the issuance of a Criminal Summons; a young adult accused under subsection (c–1) apparently is forced to establish such a defense at trial. Thus, the fact that few Summonses have been issued under subsection (c–1) may not accurately reflect the scope of the burden imposed on innocent expression, for where "only an affirmative defense is available, speakers may self-censor rather than risk the perils of trial," *Ashcroft v. ACLU,* 542 U.S. at 670–71, 124 S.Ct. 2783.

The affidavits of Vincenty, Dumont, and Schiano, described in Part I.B. above, plainly state that these plaintiffs—who have never engaged in graffiti vandalism and who intend to create graffiti art only in lawful venues on unprohibited surfaces—have indeed self-censored rather than risk being prosecuted under subsection (c–1). We see no error in the district court's finding that "[i]t appears ... at this stage of the litigation" that subsection (c–1)'s prohibition against young adults' possession of spray paint and markers in public places—because it applies "even where th[ ]e individuals have a legitimate

purpose for their use" (May 1 Tr. 62)—imposes a substantial burden on innocent expression.

Further, as a practical matter, it hardly seems that the strict liability imposed by subsection (c–1) is needed for achievement of the City's goals. The statistics proffered by the City in ¶¶ 21 and 24 of the Young Declaration show that in the 123-day period from December 29, 2005, to May 1, 2006, only 2 Criminal Summonses had been issued to persons over the age of 18 and under the age of 21 pursuant to the strict-liability provision in subsection (c–1), whereas in the encompassed 107-day period from January 1 through April 17, 2006, the City had made 871 arrests under provisions that prohibit actually making graffiti on public or private property "with intent to damage such property," N.Y. Penal Law § 145.60, or possessing graffiti instruments "under circumstances evincing an intent to use same in order to damage such property," *id.* § 145.65. Thus, since barely two-tenths of one percent of the City's described graffiti-related prosecutions in 2006 had been based on a young adult's violation of subsection (c–1)—which encompasses possession for entirely lawful purposes—we cannot conclude that the district court erred in rejecting defendants' contention that the City's goal of eliminating illegal graffiti would be achieved less effectively absent the strict-liability prohibition in subsection (c–1).

### 3. *Other Arguments*

Defendants correctly note that the district court misspoke in stating that the challenged subsections "criminaliz[e] ... the *purchase*" (May 1 Tr. 62 (emphasis added)) of graffiti implements. Subsection (c) criminalizes only sale; subsection (c–1) criminalizes only possession. The error, however, is inconsequential, for though a young adult would not be subject to prose-

cution for making the purchase, the record indicates that he or she would be subject to prosecution upon leaving the store with those implements.

We also reject defendants' suggestion that the district court "implicit[ly]" engaged in an "overbreadth analysis" when it stated that "Code sections 10–117(c) and (c–1) appear unreasonable 'in the abstract'" (Defendants' brief on appeal at 29 (quoting May 1 Tr. 61)). As defendants acknowledge, the district court did not mention the overbreadth doctrine (*see* Defendants' brief on appeal at 29), and we see no indication that the district court conducted a facial analysis. Plainly, the court evaluated the challenged subsections' applicability to and effect on young adults who wish to use spray paint and broad tipped indelible markers to create lawful graffiti art. We think it clear that, by "abstract," the court merely meant that the record had not been as fully developed as it might be after trial. (*See* May 1 Tr. 61 ("it appears in the abstract, without fully developing the record *any further* at this point, but for the purpose of a preliminary injunction during the resolution of this case, it *initially* appears unreasonable") (emphases added).)

Finally, we are unpersuaded by the City's argument that because young artists can have friends, older relatives, or an art school purchase spray paint and broad tipped indelible markers for them, or can use unregulated materials such as non-indelible markers, the district court erred in finding that §§ 10–117(c) and (c–1) do not leave graffiti artists ample alternative channels of expression. Plaintiffs have stated in their affidavits that they have repeatedly been denied access to spray paint and broad tipped indelible markers. (*See, e.g.*, Schiano Aff. ¶ 11.) And they have stated that in their art work they use only these materials, which are essential to

their artistic expression because, *inter alia*, they "cover[ ] differently" (Vincenty Aff. ¶ 6), allowing them to create effects such as mists, fades, blends, and different textures that are not equally available from paints applied with a brush (*see, e.g., id.*; David Aff. ¶ 4).

 The First Amendment, of course, "does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired," *Heffron v. International Society for Krishna Consciousness*, 452 U.S. 640, 647, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981), and we have noted that the alternative channels of expression that may avoid a First Amendment violation need not "be perfect substitutes for those channels denied to plaintiffs," *Mastrovincenzo v. City of New York*, 435 F.3d at 101. But regulations that impact speech must leave open sufficient alternative avenues of communication to minimize the "effect on the quantity or content of th[e] expression." *Ward*, 491 U.S. at 802, 109 S.Ct. 2746. Although the Supreme Court in *Turner* did not explicitly incorporate the ample-alternative-channels facet of the *Ward* formulation of the intermediate-scrutiny standard into the test for regulations that incidentally burden speech, *compare Turner*, 512 U.S. at 662, 114 S.Ct. 2445, *with Ward*, 491 U.S. at 791, 109 S.Ct. 2746, the district court did not abuse its discretion by examining this factor and concluding that, at this stage of the litigation, it does not appear that the regulations leave open sufficient alternative channels to survive intermediate scrutiny. In any event, to the extent that this issue presents a close constitutional question, we defer to the discretion of the district court, *see Ashcroft v. ACLU*, 542 U.S. at 664–65, 124 S.Ct. 2783.

 In sum, we find no abuse of discretion in the district court's ruling that, on the record before it, plaintiffs are

likely to prevail on their First Amendment claims because, given subsection (c)'s hindering of young adults' access to the materials they need for their lawful artistic expression and subsection (c–1)'s blanket prohibition against young adults' public possession of graffiti implements, encompassing possession for purely lawful purposes, the challenged subsections appear to burden substantially more speech than is necessary to achieve the City's legitimate interest in preventing illegal graffiti.

## B. *Irreparable Harm*

■ Defendants also contend that the district court erred in finding that plaintiffs had established the requisite likelihood of irreparable harm in the absence of a preliminary injunction. We reject that contention as well. The district court's finding as to irreparable harm was based in part on its conclusion that plaintiffs had shown a likelihood of success on the merits of their First Amendment claims, *see, e.g., Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). This was plainly permissible given, *inter alia*, plaintiffs' sworn statements that they had never engaged in graffiti vandalism, that they wished to make only lawful use of their graffiti implements, and that they had refrained from their artistic expression because they feared prosecution under subsection (c–1).

The finding of likely irreparable harm was also based in part on the record evidence that the City intends to enforce subsection (c–1) against all young adults in possession of graffiti implements in any public place, and that a decision as to whether or not to issue Criminal Summonses to such persons on City streets and sidewalks lies within police discretion.

We note as well that defendants' attorney, in stating that "in a public place, a person under 21 cannot possess markers or spray paint," also stated that the statutory affirmative defense of consent would be available only as to possession of graffiti implements on private property: "In a public place, the affirmative defense does not apply." (April 27 Tr. 21.) Given the record, we see no error or abuse of discretion in the court's conclusion that plaintiffs had made an adequate showing as to irreparable injury.

We reject defendants' contention that the requisite showing of irreparable harm was lacking because plaintiffs had waited some four months before bringing the present action to challenge §§ 10–117(c) and (c–1). If defendants wished to oppose the injunction on that ground, they should have made that argument in the district court. We do not see an indication in the record that they did so. In any event, it would have been well within the bounds of the district court's discretion to reject that argument. *Cf. Nicholson v. Scoppetta*, 344 F.3d 154, 167 n. 6 (2d Cir.2003) ("Nor do we believe … that a court can or should properly reach any conclusions about the likelihood of irreparable harm from the strategic decisions of plaintiff's counsel to delay seeking relief until such time as the plaintiffs can actually demonstrate that relief is warranted.").

Finally, although defendants fault the district court for not making an explicit finding of irreparable harm flowing from enforcement of subsection (c) separately from subsection (c–1), we see no abuse of discretion, for those subsections are not independent of one another as a practical matter. Although defendants contend that a young adult artist who cannot purchase graffiti implements in the City could purchase those implements outside the City without violating subsection (c), the artist could not bring those implements back to

his or her home or school in the City without violating subsection (c–1).

CONCLUSION

We have considered all of the City's contentions on this appeal and, for the reasons stated above, conclude that the district court did not abuse its discretion in granting the preliminary injunction barring the City's enforcement of Code §§ 10–117(c) and (c–1) against young adults over the age of 18 and under the age of 21. In the meantime, nothing in the injunction prevents the City from continuing to enforce New York Penal Law §§ 145.60 and 145.65 (or similar provisions in § 10–117) against persons who engage in graffiti vandalism or possess graffiti implements in public areas with intent to do so—sections that accounted for some 99.8% of the graffiti prosecutions described by defendants for the first several months of 2006.

The order of the district court is affirmed.